Eugene E. PETERSEN, an Individual; and Petersen Tool Co., a Nebraska corporation, Plaintiffs,

v.

FEE INTERNATIONAL, LTD., a Delaware corporation, et al., Defendants.

Civ. No. 72–181.

United States District Court, W. D. Oklahoma, Civil Division.

March 29, 1974.

John B. Hayes, Oklahoma City, Okl., John E. Reilly, Denver, Colo., for plaintiffs.

Jerry J. Dunlap, Robert M. Hessin, Oklahoma City, Okl., for defendants.

## MEMORANDUM OPINION

DAUGHERTY, Chief Judge.

Plaintiffs claim Defendants are guilty of patent infringement, false marking and unfair competition, the latter under both Federal and State Statutes. Plaintiffs claim to own U. S. Patent No. 3,555,939 (939) which Defendants are alleged to have infringed and U. S. Patent No. 3,368,432 (432) which patent number Defendants are alleged to have used in the false marking claim. 939 covers an open-end or "crescent" type wrench which is helix operated by a knob running up and down the handle. fendants' contention that such an agreement was entered into which was binding on Plaintiffs and Helix.

## VALIDITY

The Plaintiffs claim Defendants are infringing claims 1 through 5 of 939 by their wrench manufactured in and imported from Japan. Notice of infringement and false marking was given by Plaintiffs to Defendants on December 2, 1971. 35 U.S.C. § 287. It is clear and Defendants concede that all of claims 1 through 5 of 939 cover their wrench sold under the name "Quali-Kraft". Indeed, it was made from Halls' drawings given Defendants by the Elders.

First, the Court finds that the Defendants are estopped to challenge the validity of 939 by their false and fraudulent claims to own the same by the Helix to Resco assignments. Though, ordinarily, there is no estoppel to deny the validity of a patent, Lear, Incorporated v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969); Scott Paper Co. v. Marcalus Co., 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47 (1945), this case presents those most extraordinary circumstances as heretofore set forth, which require the application of the doctrine of estoppel. Nordhaus, Patent; Trademark & Copyright Infringement, 1971. See Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 54 S. Ct. 146, 78 L.Ed. 293 (1933). The case of Lear, Incorporated v. Adkins, *supra*,

is distinguished and does not prevent estoppel as the Court specifically finds that Defendants are not licensees of Plaintiffs as to the 939 Patent.

Moreover, the Court finds claims 1 through 5 of the Patent to be valid, not to have been obvious by the prior art, that Halls was the true inventor and such patent was not abandoned by Halls.

■ A duly issued patent is presumed to be valid. The burden of establishing invalidity rests on the party asserting the same. This presumption may be overcome only by clear and convincing evidence. 35 U.S.C. § 282; Bewal, Inc. v. Minnesota Mining & Manufacturing Co., 292 F.2d 159 (Tenth Cir. 1961); Ortman v. Maass, 391 F.2d 677 (Seventh Cir. 1968). The questions of invention and patentability are fact questions. A. E. Stanley Manufacturing Co. v. Harvest Brand, Inc., 452 F.2d 735 (Tenth Cir. 1971). It is clear from the large number of patents and the evidence herein that in dealing with a helix operated wrench we are dealing in a "crowded art" in which there has been a narrow margin of improvement between patents, hence the doctrine of equivalents, Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097, has reduced application and claims should be read narrowly to avoid prior art wherever possible. Maloney-Crawford Tank Corp. v. Sauder Tank Co., 465 F.2d 1356 (Tenth Cir. 1972).

■ Defendants assert that claims 1 through 5 of 939 are anticipated by a body of prior art consisting of a large number of patents and particularly the Schlote Patent No. 2,759,987 (987) which Defendants now own, having acquired the same on or about February 14, 1973. However, the Court agrees with the invention and patentability of 939 over the prior art and the propriety of the issuance of the 939 Patent by the Patent Office.

The 939 patent relates to a thumb operated open-end jaw wrench. The 939 wrench is characterized in particular by the fact that all of the operating parts necessary to open and close the movable jaw in the head of the wrench are *preassembled on the cover plate* and *located in the forward part of the handle* so that the wrench can be gripped with one hand and the jaw operated with the thumb or finger of that hand. The improved form of wrench invented by Halls in 1966 and 1967 resulted in the

By way of defense, Defendants claim they (Resco) own 939 and if this is not so they are not guilty of infringement because 939 is invalid over published prior art and Halls (the inventor by patent office records) was not the true inventor and that Halls abandoned the invention. Defendants deny wilful mismarking of any consequence. Defendants have also filed a counterclaim in which they assert that Plaintiffs are violating the Schlote Patent No. 2,795,987 (987) which Defendants own. As the issues have been drawn, the Court will consider in order the matter of title, patent validity, infringement, patent mismarking, unfair competition and the counterclaim.

### TITLE

The evidence overwhelmingly shows 939 Patent ownership in Plaintiffs. The Court finds the assignments relied on by Defendants to be false documents and to constitute a fraud. Halls assigned this patent to Western Tool Company of Denver, Colorado who assigned the same to Central Control Corporation who assigned the same to Helix Tool Company (Helix) who assigned the same to Plaintiff Eugene E. Petersen (Petersen) on April 14, 1970. This latter assignment was filed of record by Petersen in the United States Patent Office on May 18, 1970 and Petersen's name appeared as the assignee of record on the face of the patent when it was issued on January 19, 1971.

■ The Defendants' claimed assignment of Helix to Resco under date of February 27, 1970 is clearly false and fraudulent. Plaintiff Petersen who

owned seventy (70%) per cent of Helix knew nothing of this Helix to Resco assignment which was signed by Leslie D. and Rex Elder, as President and Secretary of Helix until June 1, 1972 when he was deposed herein. It was not accomplished or authorized by the Corporation as required by Nebraska law and amounts to a breach of a fiduciary obligation by the Elders. Eleven days prior to the date of said assignment Helix, by a document signed by the Elders, granted an option to one George I. Rosenthal on the 939 patent which option did not expire until April 2, 1970, over a month after the alleged date of the Helix to Resco assignment. The February 27, 1970 assignment from Helix to Resco contained some identical language which was not composed and put on certain of the patent papers by counsel for Helix until April 14, 1970. The alleged consideration from Helix to Resco was not delivered for eleven months after February 27, 1970 and then was never delivered to Helix by the Elders. The Elders joined in the April 14, 1970 assignment from Helix to Petersen and told Petersen nothing of the alleged earlier assignment to Resco. This Resco assignment was not recorded in the United States Patent Office for over two years or until May 20, 1972 and not within three months of its date as provided by 35 U. S.C. § 261. The second Helix to Resco assignment of March 7, 1972 was but a further fraudulent move of Les Elder and the Defendants. At this time Helix was a dissolved company and Petersen was the known assignee of the patent and the record owner in the United States Patent Office. The Helix to Resco assignments of February 27, 1970 and March 7, 1972 are the most clearly established case of falsity and fraud as this Court has experienced in nearly twenty years of trial experience. Plaintiffs are found to be the owners of Patent Nos. 939 and 432. Defendants do not own the same and their claims of ownership of 939 are false and fraudulent. The Court further finds from the evidence that Plaintffis did not reach an agreement or understanding with the Defendants or any of them whereby Defendants would undertake the manufacture of the Helix wrench in Japan or the Far East. Nor did Helix reach any such agreement. The most that occurred was a discussion on this point which never ripened into an agreement. Nor did Plaintiffs or Helix authorize Defendants to spend large sums of money as Defendants claim in investigating this possibility thereby causing Defendants to become a licensee of 939. Under the evidence the Court specifically rejects Defirst commercially successful thumb-operated open-end wrench, notwithstanding earlier efforts to develop a wrench of this type dating back as far as the turn of the century, almost seventy years prior to Halls' invention. The various devices unsuccessfully developed in the past are represented by the numerous patents which have been urged by the Defendants. Characteristic of the early efforts to devise a commercially successful thumb-operated wrench are the patents of Schlote which were granted in the period 1952 to 1964. Notwithstanding the continued efforts of Schlote to develop a thumb-operated wrench, none was commercially successful or workable under actual conditions of use. The problems and difficulties inherent either in the manufacture or use of all of the prior art wrenches of the thumb-operated type were formation of an elongated bore or cavity through the greater or entire length of the handle and indented into the head of the wrench which greatly weakened the handle and the head; utilization of a long actuating screw or shaft throughout the major length of the handle which could not be regulated by the finger or thumb when gripped in one hand; the construction of the wrenches by their nature required complicated casting and machining operations and the assembly and installation of a number of parts was extremely tedious and time consuming which made the wrenches very impracticable to mass produce; utilization of flexible or long screw actuating mem-

bers made alignment difficult between the screw and drive gears and very often lead to jamming or inability to open or close the movable jaw and in many cases the movable jaw was not self locking in the direction of opening and maintenance and cleaning of the parts was difficult. Over the years prior to the Halls' invention prior art workers attempted to deal with the manufacture and structural problems in the formation of a thumb-operated open-end wrench. Though many suggested utilization of a spiral or helix type of screw which would be mounted for rotation in the bore or groove formed in the handle of a wrench and which through a drive gear or pinion would serve to rotate a gear associated with a movable jaw to open and close the wrench, none devised a satisfactory method or means of gripping and operating the wrench with one hand while greatly strengthening the wrench and simplifying its construction.

Other prior art suggested utilization of various forms of actuating screws mounted in the handle of the wrench and some means to advance or rotate the screw for opening and closing a movable jaw at the head of the wrench. Up to the time of the Halls' invention, however, most adopted very much the same approach as Schlote in which an elongated screw is supported by bearings for rotation in a cavity or channel extending the greater length of the handle and utilizing various different forms of control members to effect rotation of the screw in driving the movable jaw to the desired position. The particular problem which resulted from this approach was the difficulty in gripping the wrench with one hand and with the same hand effecting the necessary movement of the movable jaw without regripping several times and advancing along the major length of the handle. Associated were attendant difficulties of misalignment, jamming and unreliable locking of the movable jaw in advancing it to the desired position.

The particular advantage of Halls' invention resided in the formation of the cavity in the forward part of the handle, elimination of separate parts by unifying and connecting together the screw actuating member and bearings on the inner surface of the cover plate so that when the cover plate is mounted in place over the cavity the actuating member is automatically aligned for driving engagement with the gear or screw for the movable jaw. As a result, the cavity does not support the bearings and therefore does not establish alignment between the actuating member and the operating part at the head of the wrench.

The 987 Patent to Schlote was relied upon by the Patent Office Examiner as the principal reference in his initial rejection of claims 1 through 5 of the 939 Patent. In response to the Examiner's initial rejection, claim 1 was amended and was urged to be patentably distinguished over Schlote (1) as the cavity is formed in one side of the forward end of only the handle and terminates at one end adjacent to the head thereby eliminating the cavity and cover plate portion in the head of Schlote; (2) the screw actuating member is defined as having bearing members at opposite ends removably inserted in the cavity to rotatably support the screw actuating member, as opposed to 987 where the rear bearing member is permanently attached to the rear end of the handle and the front bearing member and resilient actuating screw are separately inserted into the cavity; and (3) the cover plate is removably attached to the side of the handle over the cavity to retain the bearing members in the cavity with the screw actuating member aligned for intermeshing engagement with the screw, whereas, in 987 only the front bearing member is retained in the cavity by the cover plate. The Examiner considered the differences as claimed in claim 1 and those claims dependent from claim 1 to be sufficient to patentably distinguish over the 987 Patent and the other secondary references relied upon. In other words, those improvements as claimed when considered in light of the specification and the file wrapper of the patent

would not have been obvious to one of ordinary skill in the art at the time of the filing of the 939 application.

A consideration of the extensive number of patents relied upon by the Defendants shows that of the more than thirty patents relied upon, almost without exception, each is directed to a spiral shaft mounted in the handle of a wrench by bearing members with a gear at the forward end of the spiral engagable with another gear on the end of a worm or other screw member which drives an adjustable jaw toward and away from the fixed jaw of the wrench. A detailed comparison just of the patents granted to Schlote in the period from 1920 through 1964, consisting of eight different patents, shows that each defines a narrow improvement over the earlier patents. Referring to the 1956 patent to Schlote No. 2,753,748 the improvement over the prior art resided in the particular mounting of the spiral shaft in the rear bearing assembly as shown in Figure 2 of the patent. While the balance of the wrench assembly was admittedly old, this particular disposition and mounting of the end of the spiral shaft in a bearing was so claimed and held to be patentable. In the Schlote 987 patent granted in 1957 the particular advance made was in the disposition of a cover plate extending over open-sided dogleg channels which extended substantially the full length of the handle and into the head of the wrench. Again the margin of improvement was very slight, particularly in relation to the earlier 748 Schlote patent which disclosed a wrench body and head formed in two sections with a cavity or channel in one section and covered by the other half-section of the wrench. The only distinction resided in the removable attachment of the slide over the continuous cavity which extended through the head and handle of the wrench and was so claimed in all claims of the patent. This margin of improvement is particularly narrow in light of the patent to Ellis, Jr. No. 2,708,386 dated May 17, 1955 which discloses a cover plate removably attached over the actuating member. Similar improvements, although minor, but which were considered to be patentable in this crowded art are shown in the more recent patents to Schlote 2,993,398 of July 25, 1961 and 3,125,911 of March 24, 1964. Plaintiffs' expert testimony on the narrow margin of improvement required in this art to define a patentable invention was not successfully refuted by the Defendants' expert.

Comparing the distinctions of claim 1 over Schlote 987 and other secondary art relied upon by the Defendants, the margin of improvement based on the distinctions of claim 1 over the prior art is as great if not greater than those of the prior art patents. This would demonstrate that the improvement as claimed would not have been obvious to one of ordinary skill in the art at the time the invention was made. It is also important to note that in Schlote the cover plate does not retain *either* of the bearing members in the cavity so as to align the screw-actuating member with the screw, as recited in the concluding phrase of claim 1; instead, each of the bearing members is supported by the cavity, as a result of which the spiral shaft is located and aligned by the cavity, not by the cover plate and the bearings are not mounted on the cover plate as required by the recitation of claims 1 and 2 of the 939 patent.

Other features of the Halls patent are recited in claims 2 to 5 which are dependent from claim 1 of the patent: Claim 2 specifies that the cover plate, screw-actuating and bearing members are *preassembled* with the bearing members projecting inwardly from the inner surface of the cover plate in spaced-apart axially aligned relation to support opposite ends of the screw-actuating member in spaced parallel relation to the inner surface of the cover plate. Preassembly or unification of the elements prior to insertion into the cavity is not disclosed or suggested by the prior art. However, Defendants contend that the word "preassembled" is a process limita-

tion, not a structural limitation. When read in light of the specification where the term "preassembled" is used throughout to describe the unification of elements in a particular relationship with respect to the inner surface of the cover plate it requires that the parts be connected together in the specific relationship defined in the claim and is therefore a structural limitation. Read as a whole, the claim is limited to a structure in which the bearing members project inwardly from the inner surface of the cover plate and support opposite ends of the screw-actuating members in spaced parallel relation to the inner surface of the cover plate prior to insertion in the cavity. Again, this feature is important in that alignment of the drive shaft with respect to the screw in the head of the wrench is determined by its preassembly on the cover plate and not on mounting in the cavity as suggested by the prior art patents.

Claim 3 calls for a cover plate which includes inwardly spaced laterally projecting ribs at one end for insertion in channels along opposite sides of the cavity for retention of the cover at one end of the cavity and attaching means to secure the opposite end of the cover plate to the handle in aligned relation to the cavity, the attaching means being shown in the preferred form as the screw 49. The additional limitations of claim 3 must be read together with claim 1 in determining patentability over the prior art. There is no suggestion or teaching in the prior art of the particular inward spacing of laterally projecting ribs, such as the ribs of the Halls patent which fit into channels at the forward end of the cavity to anchor the front end of the cover plate in place. While this particular feature is a narrow improvement, it does eliminate the necessity of separate attaching means at the forward end of the cover plate.

Claim 4, dependent from claim 1, defines in detail the bearing blocks which project inwardly in spaced parallel relation to one another from the inner surface of the cover plate with aligned openings for lengthwise insertion of the screw-actuating member, the screw-actuating member being a rigid screw shaft having opposite ends forming integral axial extensions of the shaft to be journaled in the bearing blocks, and a drive pinion 54 is fixed at the forward end of the shaft. Defendants contend that the term "projecting inwardly" does not require connection of the bearing blocks to the inner surface of the cover plate. However, the term when read in light of the specification and the context of the entire claim could have no other meaning. For example, lengthwise insertion of the shaft through the bearing blocks is necessitated by the fact that the bearing blocks are connected to the inner surface of the cover plate together with the fact that the screw-actuating member is a rigid screw shaft.

Claim 5 is dependent from claim 2 and therefore incorporates by reference all of the limitations of claim 2 as well as claim 1 and further recites in some detail the particular construction and arrangement of the guide slot in the cover plate, the slide member secured in the guide slot and the particular construction of the slide member itself. This claim therefore requires the preassembled cover plate assembly as defined in claim 2 together with the cooperative disposition and relationship between the cover plate assembly and cavity as recited in claim 1. Defendants rely upon the patents to Schlote 2,447,094 and 2,753,748, also, for disclosing the same type of slide member. However, lacking from these references is any disclosure of an enlargement of the shank of the slide member which engages the inner face of the cover plate and a concentrically positioned protuberance at the inner end of the shank portion. When read in light of the specification and drawings, particularly Figure 7 of the drawings, the Schlote patents referred to fail to disclose the same mounting and disposition of the slide member.

■ It is the opinion and finding of the Court that claims 1 through 5 of 939

satisfy the test of The Eimco Corporation v. Peterson Filters and Engineering Company, 406 F.2d 431 (Tenth Cir. 1968), wherein it was said:

"Generally, when elements old . . . are combined together in manner which secures a new and useful result or an old result in a more facile, economical and efficient manner, there is a patentable combination."

939 meets the separate tests of patentability of utility, novelty and non-obviousness. The Eimco Corporation v. Peterson Filters and Engineering Company, *supra.*

The Court therefore finds and concludes that 939 is a valid patent not anticipated by the prior art and obvious to a person having ordinary skill in the pertinent art as claimed by Defendants. 35 U.S.C. § 103. Claims 1 through 5 of 939 are *not* mere design changes or obvious changes in relation to the prior art *not* amounting to invention. Graham v. John Deere Company, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); Bewal, Inc. v. Minnesota Mining & Manufacturing Co., *supra.*

Defendants have the burden to prove by clear and convincing evidence that Halls was not the true inventor of claims 1 through 5 of the 939 patent as they have claimed herein to establish invalidity of the patent. The Court finds that Defendants have not discharged this burden. Defendants claim that persons and companies hired by Halls to do certain designing, building of prototypes and mechanical work are the true inventors is not persuasive. Nor is Defendants' claim that Alfred Brickley is the true inventor or a joint-inventor persuasive under the evidence. The Court finds that the activities of Brickley were under the direction and supervision of Halls. The Court finds that Halls conceived the original ideas and principles embodied in 939. The work and any suggestions of those engaged by Halls, including Stuska and Brickley did not amount to a new method or arrangement or a new invention. Under the evidence their activities were insufficient to deprive Halls of his patent. Agawam Co. v. Jordan, 7 Wall. 583, 19 L.Ed. 177 (1868). Also see Pointer v. Six Wheel Corporation, 177 F.2d 153 (Ninth Cir. 1949).

Nor did Halls abandon his invention. 35 U.S.C. § 102(c). Here the burden is on Defendants to show abandonment by clear and convincing evidence. Defendants have failed to so establish abandonment. This is a question of fact with all reasonable doubts resolved in favor of 939. Crown Cork & Seal Co. v. Aluminium Stopper Co., 108 F. 845 (Fourth Cir. 1901). The prior application of Halls (Serial No. 255,290) which he did abandon was not prior art against claims 1 through 5 of 939 and the Court so finds. It is patently clear that after such abandonment Halls continued his efforts to improve and develop the wrench which efforts culminated in the application for 939. Defendants' evidence fails to establish abandonment. There is no evidence of expressed intent or conduct by Halls to abandon 939 and the principles involved therein.

Therefore, the Court concludes that 939 is a valid patent, the same is not invalid over the prior art under either 35 U.S.C. § 102 or § 103, Halls was the true inventor, he did not abandon the invention and Defendants have infringed the same by their "Quali-Kraft" wrench.

## PATENT MISMARKING

The evidence is undisputed that Plaintiffs own Patent 342 and Defendants acknowledge that they mismarked certain of their wrenches with this patent number without Plaintiff's consent. Defendants claim this was due to a misunderstanding with their Japanese manufacturer and that they corrected the matter. Nonetheless the Court finds that Defendants violated 35 U.S.C. § 292 through false marking with bad purpose and intent to deceive the public. Graffius v. Weather-Seal, 165 F.2d 782 (Sixth Cir. 1948).

## UNFAIR COMPETITION

 The Court finds from the evidence that Defendants have unfairly competed with the Plaintiffs in violation of the Lanham Act, 15 U.S.C. § 1125(a) and the provisions of the Oklahoma Deceptive Trade Practices, 78 Oklahoma Statutes §§ 53 and 54 by misrepresenting ownership of the 939 patent when it was not owned by the Defendants thereby making false representation as to the source of the goods and as to their affiliation or association with another, mismarking of "Quali-Kraft" wrenches with a patent number owned by the Plaintiffs where the wrenches were not in fact covered by the patent and where the Defendants knew or should have known that they did not hold valid title to the 432 patent, by selling their "Quali-Kraft" wrenches through Helix-International in competition with the "Helix" brand wrenches sold by the Defendants when the Defendants knew or should have known that customers were likely to confuse the source of the goods and Defendants were guilty of passing off their goods as those of another, and, by misappropriating to their own use the confidential drawings of Western Tool which were obtained from a former officer of Helix some time after dissolution of the company and after the Defendants knew that the assets of Helix had been assigned to the Plaintiff Petersen. These confidential drawings enabled the Defendants to secure manufacturing in Japan for the "Quali-Kraft" wrenches and thereby enabled them to enter into direct competition with the Plaintiffs within a few months after receipt of the drawings.

The Court further finds that such unfair competition has been deliberate, wilful and malicious and in direct violation of the Statutes last above cited. Parkway Baking Co. v. Freihofer Baking Co., 255 F.2d 641 (Third Cir. 1958); Apollo Distributing Co. v. Apollo Imports, Inc., 341 F.Supp. 455 (D.C.N.Y.1972).

## DEFENDANTS' COUNTERCLAIM

Defendants have filed a Counterclaim herein against Plaintiffs for an alleged infringement of United States Patent No. 2,795,987 (987) to Schlote. This Counterclaim was filed with Defendants' Third Amended Answer on April 13, 1973. Defendants only acquired rights in 987 on or about February 14, 1973 by an exclusive license from Space Tool, Inc. and the acquisition of a further license and royalty agreement pertaining thereto between Space Tool and Henry F. Colquitt (Colquitt), the assignor thereof to Space Tool. 987 expires on June 18, 1974 and has not been commercially used despite several attempts by prior owners.

From the evidence the Court finds and concludes that Defendants are entitled to no relief on their Counterclaim by reason of Patent misuse of 987 and because 939 does not read thereon. Other defenses raised to the Counterclaim have validity but one or both of the above reasons preclude any relief to Defendants and the Court goes no further for the sake of brevity.

### Patent Misuse

 Space Tool, Colquitt and Defendants have all become a part of and involved in an improper extension of the patent monopoly of 987. This results from Colquitt obtaining exclusive manufacturing and selling rights and a royalty agreement from Space Tool in 987 when he assigned 987 to Space Tool. Paragraph 4 of said royalty agreement which has been assigned to Defendants by Colquitt provides for the payment of royalties from June, 1974 to June, 1977 which period extends three years beyond the expiration date of the 987 patent. As a result of this acquisition, Defendants guaranteed payment of royalty by Space Tool to Colquitt extending beyond the life of the 987 patent and specifically for the period from June, 1974 to June, 1977. The payment of royalties beyond the expiration date of a patent constitutes misuse of the patent and is

unlawful. Brulotte v. Thys Co., 379 U. S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99 (1969). It is not material that Plaintiffs were not a party to any of the various agreements and assignments between Space Tool, Colquitt and Defendants. In their "ball of wax" is patent misuse with an adverse effect upon the public which disqualifies Defendants from claiming infringement of 987. Morton Salt v. G. S. Suppiger, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942). This belated during-trial acquisition by Defendants of 987, tainted with an unlawful extension of patent monopoly and then making the same the basis of a counterclaim against Plaintiffs, is but another impropriety found in Defendants' activities in the Helix wrench field.

*Infringement*

Moreover, absent patent misuse, 939 does not read on 987. Defendants claim 939 infringes on claim 6 of 987. Claim 6 reads:

"6. An end wrench comprising a wrench body including an elongated handle and a head formed integral with one end of said handle and recessed to provide a stationary jaw, a sliding jaw reciprocably supported by said wrench head for movement toward and away from the stationary jaw, said wrench body having a substantially flat side and having channels formed therein and opening outwardly of said flat side, one of said channels being formed in the head and the other channel being formed in said handle and disposed at an angle to the channel of the head and having an end communicating with the head channel, said channels being adapted to said movable jaw and operable for moving said movable jaw toward and away from the stationary jaw, a cover plate detachably connected to said wrench body and covering the channels thereof, said cover plate having an elongated slot in the part thereof overlying the handle channel and in which a slide is adopted to be supported in engagement with a part of the movable jaw actuating mechanism for imparting torque to said mechanism."

The 987 patent can be basically characterized as a sliding jaw open-end wrench in which the necessary parts to operate the sliding jaw are housed in channels formed both in the head and the entire length of the handle of the wrench. A common cover plate is secured both over the channel in the head and in the handle. From a comparison with prior art patents, including several patents which had already issued to G.F. Schlote dating back as early as 1920, the principal point of novelty resided in the manner in which communicating channels opened outwardly of the head and handle of the wrench to house the operating parts, the channels and operating parts being covered by a common cover plate. Indeed, the patentee stated in one of the concluding paragraphs of the patent that "while the manner of operation of the wrench as previously described is not unique, the construction thereof is extremely novel" and then proceeded to describe the manner in which the cover plate can be removed from the channels to expose all of the operating parts.

The only claim alleged to be infringed by the Plaintiffs' wrench is claim 6 of the patent which specifically recites that the wrench is provided with channels which are formed both in the head and the handle in communication with one another and both of which channels open outwardly of the flat side of the wrench together with a cover plate which covers both channels.

In the Plaintiffs' wrench a bore or recess is formed through one end of the head and a channel is formed in only the forward part of the handle. Certain of the operating parts necessary to drive the sliding jaw are inserted through the end of the head into the bore and other operating parts are inserted into the channel formed in the handle to engage those parts in the head. Only the channel in the handle is covered by a cover plate and therefore Plaintiffs' wrench eliminates the cover plate portion re-

quired by Schlote to cover the channel formed in the head.

Defendants contend that the side of the bore or recess formed in the head of Plaintiffs' wrench, since it communicates with the channel formed in the handle, can be said to open outwardly of the flat side of the head and that the cover plate in the handle also "covers" the bore formed within the head. In Plaintiffs' wrench, whatever might be said about communication between the bore in the head and the channel formed in the handle, the bore formed in the head does not open outwardly from the side of the head as recited in claim 6; nor does Plaintiffs' cover plate extend over the bore formed in the head as recited in claim 6 in issue.

The only departure from the prior art in claim 6 of 987 is that portion of the claim directed to the channel configuration and removable disposition of a cover plate over the channel. However, 939 eliminates the channel in the side of the head as well as that portion of the cover plate which extends over said channel in the head. This difference is not a mere matter of design change but achieves a vastly stronger wrench over 987 through the elimination of these features. Thus, the 939 wrench is outside claim 6 of the 987 patent. Applicable here is the case of Jensen-Salsbery Laboratories, Inc. v. O. M. Franklin Blackleg Serum Company, 72 F.2d 15 (Tenth Cir. 1934) which states:

"Every element of a combination or step in a process claimed is conclusively presumed to be material. The omission of one element, ingredient, or step of a combination claim avoids infringement of that claim, whether or not the omitted element, ingredient, or step was essential to the combination.

. . . . . .

"In Fay v. Cordesman, 109 U.S. 408, 420, 3 S.Ct. 236, 244, 27 L.Ed. 979 the court said: 'The claims of the patents sued on in this case are claims for combinations. In such a claim, if the

patentee specifies any element as entering into the combination, either directly by the language of the claim, or by such a reference to the descriptive part of the specifications as carries such element into the claim, he makes such element material to the combination, and the court cannot declare it to be immaterial. It is his province to make his own claim and his privilege to restrict it. If it be a claim to a combination, and be restricted to specified elements, all must be regarded as material, leaving open only the question whether an omitted part is supplied by an equivalent device or instrumentality.' "

Also, see Band-It Co. v. McAneny, 131 F.2d 766 (Tenth Cir. 1942), cert. den. 318 U.S. 773, 63 S.Ct. 770, 87 L.Ed. 1143, reh. den. 318 U.S. 803, 63 S.Ct. 980, 87 L.Ed. 1166; Texas Co. v. Anderson-Prichard Refining Corporation, 122 F.2d 829 (Tenth Cir. 1941); Haynes Stellite Co. v. Osage Metal Co., 110 F.2d 11 (Tenth Cir. 1940).

The elimination of the channel in the head as well as the cover plate extension over the head was a significant improvement in the helix wrench which makes the difference between commercial success or failure in the market place as shown here by the inability of all prior owners of 987 to bring about a successful commercial venture with the 987 wrench because of weakness in the head. It is interesting to note that Space Tool when owning this patent (987) bought "Quali-Kraft" wrenches from Defendants which as aforesaid read on and infringed 939.

Plaintiffs are therefore entitled to Judgment finding them to be the owner of Patent 939, that said patent is a valid patent and Defendants' claims of invalidity, that Halls is not the true inventor thereof and that Halls abandoned the invention are all without merit, that Defendants are infringing on Patent 939 with their "Quali-Kraft" wrench, that Defendants are guilty of mismarking some of their wrenches with Patent 432 which patent is owned by Plaintiffs,

that Defendants are guilty of unfair competition against Plaintiffs in violation of both Federal and State Statutes and that Defendants are not entitled to assert infringement of 987 by 939 by reason of patent misuse of 987 and additionally that 939 does not infringe on 987.

Plaintiffs are further entitled to a permanent injunction against Defendants, their officers, agents, employees and those in privity with them, against further infringement of 939, a permanent injunction against Defendants, their officers, agents, employees and those in privity with them, against further false marking by the use of Patent 432 and a permanent injunction against Defendants, their officers, agents, employees and those in privity with them against further unfair competition by them against Plaintiffs.

Plaintiffs are further entitled to an Order directing an accounting of profits and damages from Defendants for the said infringement of 939 and a determination whether any damages should be trebled by reason of Defendants' alleged wilful and intentional infringement, an accounting of profits and damages from Defendants for said false marking of wrenches, an accounting of profits and damages from Defendants for said unfair competition and a further order that the matter of whether Plaintiffs are entitled to reasonable attorneys' fees and costs will be conducted at the close of the accounting to be conducted herein.

The foregoing judgments of ownership of 939 and 432, validity of 939, infringement of 939 by Defendants "Quali-Kraft" wrench, mismarking, unfair competition and that Defendants are not entitled to assert infringement of 987 by 939 and that 939 does not infringe on 987 are final judgments. 28 U.S.C. § 1292(a)(4). The Court will reserve jurisdiction of this Cause for the foregoing accounting, determination of profits and damages, if any, trebling of damages, if any, and for consideration of the question as to the allowance to Plaintiffs of attorneys' fees and costs. Mott Corporation v. Sunflower Industries, Inc., 237 F.Supp. 14 (D.Kan.1964).

Counsel for Plaintiffs will prepare an appropriate Judgment and Order based on the foregoing, submit the same to opposing counsel and then to the Court for signature and entry herein.